IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY CLOUTHIER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF CONTRA COSTA, et al.,<br><br>Defendants.<br>_____/ | No. C-06-3893 MMC<br><br>**ORDER GRANTING RUPF'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART BLUSH'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART STEELE'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART FOLEY'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART COUNTY'S MOTION FOR SUMMARY JUDGMENT; DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER REMAINING STATE LAW CLAIMS**<br><br>(Docket Nos. 28, 31, 34, 37, 53) |

Before the Court are five motions for summary judgment, filed June 22, 2007 on behalf of, respectively, defendants County of Contra Costa ("County"), Sheriff Warren Rupf ("Rupf"), Sheriff's Deputy Matt Foley ("Foley"), Sheriff's Deputy Erik Steele ("Steele"), and licensed mental health specialist Margaret Blush ("Blush"). Plaintiffs filed a consolidated opposition to four of the five motions; plaintiffs state they do not oppose Rupf's motion. The County, Rupf, Foley, and Steele filed a consolidated reply in support of their motions; Blush filed a separate reply in support of her motion. On August 17, 2007, the matter came on regularly for hearing. Stan Casper and Thom Seaton of Casper, Meadows, Schwartz &

Cook appeared on behalf of plaintiffs; Janet Holmes, Deputy County Counsel, appeared on behalf of the County, Rupf, Foley, and Steele; Thomas Manning appeared on behalf of Blush. Having considered the papers filed in support of and in opposition to the motions and the arguments of counsel at the August 17, 2007 hearing, and for the reasons set forth on the record at that hearing, the Court rules as follows.

1. Plaintiffs state in their opposition that they do not oppose Rupf's motion for summary judgment; accordingly, Rupf's motion for summary judgment is hereby GRANTED.

2. The motions for summary judgment filed, respectively, by Blush, Steele, and Foley, are hereby GRANTED with respect to the claims asserted against them under 42 U.S.C. § 1983 for violation of the due process clause of the Fourteenth Amendment to the United States Constitution. To survive summary judgment, plaintiff was required to show deliberate indifference to Robert Clouthier's ("Robert") serious medical needs, i.e., that Blush, Steele, or Foley "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." See Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir. 2002) (internal citation and quotation omitted); cf. also Redman v. County of San Diego, 942 F.2d 1435, 1443 (9th Cir. 1991) (en banc) (holding "deliberate indifference is the level of culpability that pretrial detainees must establish for a violation of their personal security interests under the fourteenth amendment").

    a. No reasonable juror could conclude that Blush was deliberately indifferent to Robert's serious medical needs. Although Blush's evaluation of Robert differed from that conducted earlier the same day by her colleague, Sharlene Hanaway, there is no evidence that Robert's condition remained unchanged in the interim. More importantly, even assuming Robert's condition had not changed, "[a] difference of [medical] opinion does not amount to a deliberate indifference to . . . serious medical needs," see Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989), and there is no evidence that Blush's evaluation of Robert was so far below any applicable standard of care as to raise a triable issue that she acted with deliberate indifference. Moreover, to the extent plaintiffs contend Blush was

deliberately indifferent by failing to document her instruction that Robert remain in the observation cell, the evidence is undisputed that mental health staff were trained that an inmate in an observation cell would remain there until expressly released by mental health staff. (See, e.g., Seaton Decl. Ex. 2 (Hanaway Dep.) 34:14-24, 38:10-14; Seaton Decl. Ex. 11 (Blush Dep.) 20:20-24). Consequently, no reasonable juror could find Blush was deliberately indifferent in failing to document her instruction that Robert remain in the observation cell.

          b. No reasonable juror could conclude that Steele was deliberately indifferent to Robert's serious medical needs. To the extent plaintiffs argue Steele is liable under § 1983 for moving Robert out of the observation cell, on the ground that Steele made no effort to determine why Robert was being kept in the observation cell and failed to consult with mental health staff before moving him, the evidence is undisputed that (1) Steele was aware that Robert initially had been placed in the observation cell because he was a danger to himself, (2) Robert thereafter was removed from the observation log, and (3) Steele was trained that when an inmate is removed from the observation log, there no longer is any restriction on a deputy's moving such inmate out of the observation cell and into another cell in M-Module. (See Seaton Decl. Ex. 17 (Steele Dep.) at 29:8-23; Steele Decl. ¶ 7; Seaton Decl. Ex. 14 (Pascoe Dep.) at 34:10-35:25.) Moreover, even though there was no requirement that Steele consult with mental health staff before moving Robert to a new cell, he nonetheless did attempt to do so. (See Seaton Decl. Ex. 17 (Steele Dep.) at 53:2-54:24.) Under such circumstances, no reasonable juror could find Steele was deliberately indifferent.

To the extent plaintiffs argue Steele is liable for failing to notify mental health staff that, on July 31, Robert had refused two meals and an opportunity for free time out of his cell, there is no evidence that Steele was required to do so; rather, the evidence is that a deputy is trained that if an inmate refuses meals or free time, the deputy should "look into [it] further." (See Seaton Decl. Ex. 14 (Pascoe Dep.) at 46:23-47:16.) While one reasonable way to do so would be to call mental health staff, (see id.), there is no evidence

1 that such action would constitute the only appropriate response.  Moreover, it is undisputed 2 that even though Robert's refusal of meals and free time occurred prior to the beginning of 3 Steele's shift, Steele nonetheless took it upon himself to speak to Robert about his conduct, 4 and found Robert's explanation that he was trying to catch up on sleep, and his agreement 5 to eat his next meal with Steele, did not raise a "red flag."  (See Seaton Decl. Ex. 17 (Steele 6 Dep.) at 40:16-42:6.)  Under such circumstances, no reasonable juror could find Steele was 7 deliberately indifferent.

8       c.  No reasonable juror could conclude that Foley was deliberately indifferent 9 to Robert's serious medical needs.  To the extent plaintiffs contend Foley is liable for failing 10 to convey to other deputies Blush's instruction on July 28 that Robert remain in the 11 observation cell, even if Foley failed to convey such instruction, such failure does not 12 amount to deliberate indifference; it is undisputed that Foley was aware that Blush had 13 removed Robert from the observation log, which log required that Robert be observed 14 every fifteen minutes, and that all inmates in M-Module were observed every thirty minutes, 15 (see Foley Decl. ¶ 9); there is no evidence that, once Blush had informed Foley that the 16 observation log was no longer necessary, Foley actually knew of and disregarded a serious 17 risk to Robert's health that would result if he were observed every thirty minutes, as 18 required for all inmates in M-Module, instead of every fifteen minutes.  Moreover, Foley 19 attests he "understood that by Blush removing Robert from the observation log, she 20 decided he was no longer actively suicidal," (see Foley Decl. ¶ 9), and there is no evidence 21 that Blush told Foley anything to the contrary.  Under such circumstances, no reasonable 22 juror could find Foley was deliberately indifferent.

23     To the extent plaintiffs contend Foley is liable because he saw Robert with a knotted 24 bedsheet shortly before his suicide, the evidence submitted likewise is insufficient to raise a 25 triable issue of material fact.  Such argument relies entirely on the declaration of Robert's 26 cellmate, who admits therein that he "didn't have [his] contacts on so [he] couldn't see 27 exactly what [Robert] was doing," (see Watkin Decl. at 2); his further statement that Foley 28 "sure should have been able to see" the knotted sheet, (see id. at 2-3), is conclusory and

4

1  without foundation.  Under such circumstances, no reasonable juror could find Foley was
2  deliberately indifferent.[1]

3       3.  The County's motion for summary judgment is hereby GRANTED with respect to
4  the § 1983 claim asserted against it.  "[I]n enacting § 1983, Congress did not intend to
5  impose liability on a municipality unless deliberate action attributable to the municipality
6  itself is the 'moving force' behind the plaintiff's deprivation of federal rights." Board of the
7  County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 400 (1997)
8  (emphasis in original) (citing Monell v. New York City Dept. of Social Services, 436 U.S.
9  658, 694 (1978)).  One way to demonstrate municipal liability is to show that a municipal
10 employee "committed the alleged constitutional violation pursuant to a formal government
11 policy or a longstanding practice or custom which constitutes the standard operating
12 procedure of the local governmental entity." See Gillette v. Delmore, 979 F.2d 1342, 1346
13 (9th Cir. 1992) (internal quotations and citation omitted).  Here, however, as discussed
14 above, plaintiffs have not raised a triable issue as to the existence of any constitutional
15 violation by any of the individual defendants.  "A public entity is not liable for § 1983
16 damages under a policy that can cause constitutional deprivations, when the factfinder
17 concludes that an individual officer, acting pursuant to the policy, inflicted no constitutional
18 harm to the plaintiff." Quintanilla v. City of Downey, 84 F.3d 353, 355 (9th Cir. 1996).[2]

19       To the extent plaintiffs argue the County is liable for an unconstitutional policy of
20 understaffing of mental health staff, plaintiff has failed to submit evidence sufficient to raise
21 a triable issue with respect to such theory.  Although the Ninth Circuit has upheld a § 1983

---

[1] In light of the above rulings with respect to Blush, Steele, and Foley, the Court does not reach such defendants' arguments that they are entitled to qualified immunity. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001).

[2] Moreover, to the extent plaintiffs contend the County had an unconstitutional policy of requiring a detainee to be transferred from an observation cell based solely on a mental health specialist's decision to remove the detainee from the observation log requirement, (see Opp. at 28:9-15), there is no evidence that such a policy existed, much less that it was a cause of Robert's death.

5

claim against a county based on deliberate indifference to a pretrial detainee's medical and psychiatric needs on the theory that "medical understaffing at the jail directly contributed to the decedent's suicide," see Cabrales v. County of Los Angeles, 864 F.2d 1454, 1461 (9th Cir. 1988) (affirming denial of summary judgment in favor of county in case involving suicide of pretrial detainee), the plaintiffs in that case had submitted expert testimony analyzing the psychological and medical staffing at the jail at issue and concluding that the facility was "seriously understaffed," see id. at 1460. No such expert opinion has been submitted in the instant action. Although Miles Kramer, the director of Detention Health Services for the County, testified at his deposition that the County doesn't "stipulate how often [inmates] are to be seen" by mental health staff, because it doesn't "have the staff to put in those sorts of guidelines," (see Seaton Decl. Ex. 16 (Kramer Dep.) at 53:3-5), plaintiffs, in the absence of expert testimony on such issue, have failed to demonstrate a triable issue exists as to whether the lack of staffing described by Kramer constitutes "understaffing," let alone understaffing to such a degree as to constitute deliberate indifference.

To the extent plaintiffs argue that the County is liable for an unconstitutional policy of failing to adequately train jail staff and mental health staff, plaintiffs' claim likewise fails.[3] One way to prove liability for an unconstitutional policy of failure to train is to show the municipality's "continued adherence" to a deficient training program "intended to apply over time to multiple employees." See Long v. Los Angeles, 442 F.3d 1178, 1186 (9th Cir. 2006) (internal quotation and citation omitted). "If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for." Bryan County, 520 U.S. at 407. Here, there is no evidence that the County's

---

[3] Although "[i]t may seem contrary to common sense that a municipality will actually have a policy of not taking reasonable steps to train its employees," "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." See City of Canton, 489 U.S. at 390. "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." See id.

6

1 training has resulted in repeated failure to prevent detainee suicides.  It is undisputed that
2 between 2001 and 2006, more than 175,000 inmates passed through Intake at the MDF,
3 158 suicide attempts were discovered and responded to, and that six inmates succeeded in
4 committing suicide.  (See Rupf Decl. ¶ 3.)  Rupf attests that this rate is "far lower than the
5 statewide average, and far lower than for jails in most counties with similar population
6 sizes," (see id.); there is no evidence to the contrary.  Moreover, there is no evidence that
7 any inmate suicide at the MDF resulted from "mental health staff discontinuing an
8 observation log, or permitting movement of an inmate from an observation cell to another
9 cell on the M-Module."  (See id.)

10 "A plaintiff also might succeed in proving a failure-to-train claim without showing a
11 pattern of constitutional violations where 'a violation of federal rights may be a highly
12 predictable consequence of a failure to equip law enforcement officers with specific tools to
13 handle recurring situations.'" See Long, 442 F.3d at 1186 (quoting Bryan County, 520 U.S.
14 at 409.  "The likelihood that the situation will recur and the predictability that an officer
15 lacking specific tools to handle that situation will violate citizens' rights could justify a finding
16 that policymakers' decision not to train the officer reflected 'deliberate indifference' to the
17 obvious consequences of the policymakers' choice – namely, a violation of a specific
18 constitutional or statutory right."  See Bryan County, 520 U.S. at 409.  Here, the evidence is
19 undisputed that the County provides training to jail security staff and mental health staff
20 with respect to the prevention of inmate suicide, including training by Kramer, the director of
21 Detention Health Services, with respect to the "interfacing" of jail security staff and mental
22 health staff.  (See, e.g., Kramer Decl. ¶¶ 4-9; Pascoe Decl. ¶¶ 4-5.)  There is no evidence
23 from which a reasonable juror could conclude that any deficiencies in such training rise to
24 the level of deliberate indifference.  Although the evidence before the Court demonstrates
25 that jail security staff and mental health staff had different understandings as to the effect of
26 mental health staff's removing an inmate from the observation log, there is no evidence that
27 such misunderstanding was known to the County prior to the instant litigation.
28 To the extent plaintiffs argue that the County is liable for unconstitutional "systemic

7

deficiencies" in providing care to Robert, such theory adds nothing to the complaint. The Ninth Circuit has observed, in a case involving the suicide of a pretrial detainee, that "[a] number of conditions, each of which satisf[ies] [constitutional] requirements, cannot in combination amount to a[ ] [constitutional] violation." See Cabrales, 864 F.2d at 1462.

Finally, plaintiffs argue that the County is liable under a ratification theory because Blush, Steele, and Foley were not subject to discipline for their conduct in the events in question. Although a county may be held liable on the theory that "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it," see Gillette v. Delmore, 979 F.2d at 1346-47, here plaintiffs have failed to demonstrate a triable issue with respect to whether Blush, Steele, or Foley violated Robert's constitutional rights. Moreover, even if plaintiffs had raised a triable issue as to a constitutional violation by Blush, Steele, or Foley, there is no evidence that the County made a "conscious affirmative choice" to endorse any such conduct. See Haugen v. Brosseau, 351 F.3d 372 (9th Cir. 2003) (rejecting argument that "single failure to discipline" police officer's conduct constitutes ratification of such conduct).

4. In light of the above rulings with respect to the federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3); Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Accordingly, the Court hereby DISMISSES the following claims, without prejudice to plaintiffs' reasserting such claims in state court:  (1) plaintiffs' wrongful death claim, as

//
//
//

1  asserted against Blush, Steele, Foley, and the County; and (2) plaintiffs' claim of
2  professional negligence, as asserted against Blush.
3  **IT IS SO ORDERED.**
4  Dated: August 24, 2007

MAXINE M. CHESNEY
United States District Judge